UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARK J. WALKER,                          )
                                         )
          Plaintiff,                     )      Case No. 10 C 7239
                                         )
v.                                       )      Magistrate Judge Sidney I. Schenkier
                                         )
MICHAEL ASTRUE,                          )
Commissioner of Social Security,         )
                                         )
          Defendant.                     )

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, the plaintiff, Mark J. Walker, seeks judicial review of a final

decision by the Commissioner of the Social Security Administration ("SSA") denying his application

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the

Social Security Act (the "Act"), codified at 42 U.S.C. § 405(g). Mr. Walker has moved to reverse

the Commissioner's final decision denying his claim for DIB and SSI or, in the alternative, to

remand his case for further review (doc. # 19). The Commissioner filed a cross-motion for summary

judgment to affirm the decision (doc. # 22). For the reasons set forth below, we deny the

Commissioner's motion, we grant the plaintiff's motion, and we reverse the final decision of the

Commissioner and remand for further proceedings.

## I.

We begin with the procedural history of this case. On July 17, 2007, Mr. Walker filed a Title

II application for DIB and a Title XVI application for SSI, alleging that he had been unable to work

because of a disability beginning July 15, 2006 (R. 14). The SSA denied both applications on

---

[1] On February 10, 2011, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 16).

September 27, 2007, as well as on reconsideration on January 29, 2008 (*Id.*). Mr. Walker filed a timely request for a hearing before the Administrative Law Judge ("ALJ") on February 12, 2008, which was granted (R. 84-85). The hearing took place before ALJ John K. Kraybill on September 21, 2009 (R. 24). At the hearing, the ALJ heard testimony from Mr. Walker, medical expert ("ME") Dr. Kathleen O'Brien, and vocational expert ("VE") Cheryl R. Hoiseth (*Id.*).

On October 13, 2009, the ALJ issued a written decision denying Mr. Walker's applications for DIB and SSI (R. 14). The ALJ determined that Mr. Walker had a severe impairment – bipolar disorder – but that he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 17). Further, the ALJ determined that Mr. Walker had a residual functional capacity ("RFC") "to perform work at all exertional levels but with nonexertional limitations stemming from his mental impairment that preclude public contact, limited him to only incidental contact with supervisors and coworkers, limit him to routine work without a lot of changes, and which require no high productivity expectations" (R. 18). Based on the VE's identification of jobs that existed in significant numbers in the national economy that someone with Mr. Walker's RFC and demographic information could perform, the ALJ found that Mr. Walker was not disabled (R. 22-23).

The Appeals Council denied review on September 9, 2010, thus making the ALJ's decision the final decision of the Commissioner (R. 1). Mr. Walker filed a timely complaint in federal district court on November 10, 2010 (doc. # 1).

## II.

We now summarize the administrative record. We set forth the general background and Mr. Walker's subjective medical complaints in Part A, followed by the medical record in Part B. In Part C, we discuss the hearing testimony, and we address the ALJ's written opinion in Part D.

### A.

Mr. Walker was born on August 26, 1961; he was 44 years old as of his alleged disability onset date, July 15, 2006 (R. 22). At the time of the administrative hearing, Mr. Walker lived in an apartment in Elmwood Park, Illinois with a friend, Richard Upchurch (R. 30). He is single and without any children (*Id.*). Mr. Walker has no income and his application for a medical card was denied (R. 32). He receives food stamps and has a valid driver's license (*Id.*).

Mr. Walker earned a bachelor's degree in 1981 and a master's degree in math in 1983 (R. 30). In the past, Mr. Walker served in the Peace Corp, taught at a high school, and worked overseas in the Netherlands (R. 30, 295). From April 1993 until September 2000, Mr. Walker worked as a supervisor in telecommunications and then as a systems analyst for the Wisconsin Central railroad company (R. 155). He next worked as a restaurant host and then as a car salesman until December 2004 (*Id.*). Mr. Walker last worked slicing meat and cheese at Quizno's restaurant until July 12, 2006, when he had a panic attack, ran out of the restaurant, and never returned (R. 31-32, 35, 146).

Mr. Walker testified at the hearing that he began experiencing panic attacks while working at Quizno's, which caused him to miss about two days of work per week (R. 33, 35). He currently experiences depression, anxiety, fearfulness, mood swings, and racing thoughts (R. 36). He has frequent crying spells that can last more than an hour in length (*Id.*). He experiences constant fatigue and low energy, and on a bad day he claims it is difficult for him to perform any tasks "outside of

3

immediate bodily functions" (R. 36-37). He has good, productive days only once in a while (R. 36). On his bad days, he feels apathy toward life and a lack of motivation to get out of bed (R. 39). He testified that his whole body may ache for days, and this pain makes it difficult for him to move or sometimes even tie his shoes or bend over (*Id.*). Mr. Walker testified that he has trouble sleeping; sometimes he just gets an hour or two each day and he may spend up to three days without sleeping at all (R. 37). He either has no appetite at all or a "voracious" appetite and his weight fluctuates up and down by fifty pounds (R. 38). Mr. Walker still experiences panic attacks that he believes have worsened over time (*Id.*). He describes them as a "very anxious feeling that overcomes me," characterized by shortness of breath and a sense of imminent danger, fear, and anxiety (*Id.*). Their frequency ranges from several times a month to every day (*Id.*).

Mr. Walker testified that he was not comfortable driving and spent most of his time at home watching television or trying to read (R. 32). He did not do any housework, cooking, or cleaning (R. 33). He rarely goes shopping and does not do his own laundry (*Id.*). He has no hobbies and does not do anything for fun (R. 39-40). He is reluctant to take showers each day and to shave (R. 37). He has problems with concentration and finds it difficult to retain information he reads (R. 39).

On July 11, 2009, Mr. Walker went to the emergency room complaining of chest pains and shortness of breath (R. 17). He underwent a left heart catheterization with stent placement and was discharged on July 13, 2009, with instructions to follow up at Cook County Hospital (*Id.*). Mr. Walker testified that his physician limited his psychiatric medications to just Lexapro due to the additional medication he was prescribed for his heart condition (R. 34).

**B.**

The medical record consists of notes and assessments from Mr. Walker's psychiatrist, Dr. Song Piyaka, his therapists Elizabeth Schallack and Krystyna Elmer, and a number of group therapy sessions. In addition to a Psychiatric Report and a Mental Capacities Assessment authored by Dr. Piyaka, SSA performed a number of assessments regarding Mr. Walker's condition. Mr. Walker also filled out various disability reports.

**1.**

Mr. Walker began outpatient treatment at Resurrection Behavioral Health Procare Center ("Procare") on January 29, 2007, and he was preliminarily diagnosed with Bipolar Disorder I (R. 216). Mr. Walker began weekly therapy appointments first with Elizabeth Schallack from February 21, 2007, until June 27, 2007, and then with Krystyna Elmer from July 10, 2007, until May 20, 2009, where the record ends. Records from these meetings indicated both positive and negative developments in Mr. Walker's condition. In his March 2007 appointments with Ms. Schallack, Mr. Walker at times appeared tearful, sad, depressed, and hopeless, while at other times he appeared anxious, disorganized, fidgeting, overwhelmed, and hypomanic (R. 314-21). Ms. Schallack recommended medication, and Mr. Walker made an appointment to see Dr. Piyaka the following month (R. 322).

Mr. Walker's hypomanic and depressive mood swings continued in April and May 2007 (R. 323, 326, 329, 331). His mood swung from depressed, sad, and low energy (R. 333-35, 342) to anxious, overwhelmed, high energy, and frustrated (R. 338-40). Other than one positive therapy session on June 20, 2007, where Mr. Walker was in good spirits and reported taking a "highly

enjoyable" trip (R. 344-45), his mood continued to swing from depressed with low motivation and energy to highly anxious with panic attacks in June and July 2007 (R. 346-48, 350, 352).

In August 2007, his therapy sessions with Ms. Elmer mostly revealed less anxiety and mania, but increased depression, fatigue, and anhedonia (loss of pleasure in previously enjoyable activities) (R. 355-56, 358, 360). On August 28, 2007, Ms. Elmer reported that Mr. Walker was again suffering from anhedonia, irritability, tendency to social isolation, and changing sleep patterns, indicating a deteriorating level of overall psycho-social functioning (R. 362).

In September and October 2007, Mr. Walker continued to report that his manic episodes and panic attacks had become less frequent and less severe (R. 364, 366, 368); however, at the same time, he described feeling an "unusual amount of energy" and not sleeping for three days straight, before becoming so exhausted he does not want to get out of bed (R. 365). In addition, in September and October 2007, Mr. Walker also reported that his depression was still present and debilitating -- possibly "getting worse" (R. 364, 366, 368, 374), although his mood was improved on October 9, 2007, because he was looking forward to a vacation to see his friends (R. 370). Mr. Walker reported improved mood in November and December 2007, possibly due to addition of Lexapro (R. 380, 382, 384, 387), but continued to exhibit signs of moderately to mildly depressed mood as well as anxiety, fidgeting, and irritability (R. 380, 382, 387, 389). On December 18, 2007, he was agitated again and unable to sleep (R. 391).

Mr. Walker reported improvements in his anxiety and panic attacks on some occasions in the beginning of 2008 (R. 397, 402), but Mr. Walker's depression "was still there" (R. 397). Although Mr. Walker's Lexapro dosage was increased from 10 mg to 15 mg "to alleviate escalating depression" in the beginning of February 2008 (R. 400), later that month and into March 2008, Ms.

6

Elmer continued to note a "strong presence of depressive symptoms" (R. 402, 404, 407). On March 25, 2008, Mr. Walker reported feeling less anxious after taking an increased dose of Lexapro, but still depressed and unmotivated (R. 407). On June 17, 2008, Mr. Walker was anxious and found it difficult to concentrate, and Ms. Elmer noted that he was moderately to severely depressed (R. 410). On July 15, 2008, Mr. Walker reported escalating depression and anxiety (R. 414), while on August 7, 2008, he reported improved mood and less anxiety (R. 416).

At the end of 2008, Mr. Walker continued to experience ups and downs in his symptoms. In September and October 2008, he reported that his depressive symptoms had decreased and the manic phase of his depression was slightly reduced (R. 420-22). On November 6, 2008, however, he reported recurring panic attacks (R. 424), and he was anxious and aggravated on November 25, 2008 (R. 427). On December 9, 2008, Ms. Elmer reported that Mr. Walker exhibited an anxious affect, had difficulty concentrating, and was easily distracted (R. 430).

Mr. Walker experienced heightened anxiety and difficulties in his ability to focus in the first months of 2009. Ms. Elmer noted that Mr. Walker had trouble focusing (R. 433, 441) and exhibited agitation and an anxious affect and an inability to sleep (R. 441, 449). While Mr. Walker reported increased emotional regulation on April 9, 2009 (R. 444), just a few weeks later Ms. Elmer noted that he was anxious, as evidenced by his inability to maintain proper eye contact (R. 446). During that appointment on April 29, 2009, Mr. Walker discussed with Ms. Elmer his recent initiative to engage in newsletter work with the National Alliance on Mental Illness (NAMI), and Ms. Elmer encouraged him to stay proactive regarding the project (R. 447). On May 20, 2009, Ms. Elmer again noted an anxious affect, and evident signs of agitation, fatigue and distractibility (R. 452).

7

**2.**

Dr. Piyaka began seeing Mr. Walker for monthly appointments on April 18, 2007. On that day, Dr. Piyaka diagnosed Mr. Walker with Bipolar Disorder I, rated his Global Assessment of Functioning ("GAF") at 45,[2] and prescribed him Abilify and Klonopin (R. 206). On May 9, 2007, Dr. Piyaka noted that Mr. Walker showed "minor improvement" with less severe panic attacks (R. 222), and on May 30, 2007, Dr. Piyaka noted that Mr. Walker had experienced no panic attacks in the past three weeks (R. 221). Dr. Piyaka increased Mr. Walker's Abilify dosage on May 30, 2007 (*Id.*, R. 339, 343).

On June 30, 2007, Mr. Walker reported to Dr. Piyaka that he had a recent panic attack (R. 220), but on August 22, 2007, Dr. Piyaka noted that Mr. Walker had no recent panic attacks and was "making good progress" (R. 218). In September, Mr. Walker's condition was improved, his racing thoughts had decreased, he was not pacing much, and he exhibited no loss of control (R. 271). On October 17, 2007, Dr. Piyaka noted Mr. Walker was "more under control" but added Lexapro to his medication regimen (R. 269-70).

In November and December 2007, Dr. Piyaka's treatment notes indicated that Mr. Walker's condition had deteriorated. For example Mr. Walker had not been eating and struggled to get out of bed (R. 268). On December 12, 2007, Dr. Piyaka noted that while Mr. Walker had not recently experienced mania and panic, he was still depressed, found it difficult to get out of bed, and exhibited symptoms of anxiety (R. 267).

---

[2]"GAF" – or global assessment of functioning – is a scale from 0 to 100 in which higher scores indicate greater levels of functioning, *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (4th ed. Text Revision 2000) ("DSM-IV-TR"). A GAF score of 50 falls at the top of a range that is characterized by "serious" symptoms or limitations, meaning that a score of 45 indicates that a person suffers from serious symptoms or limitations. *Id.*

Dr. Piyaka submitted a Psychiatric Report in September 2007 to the Bureau of Disability Determination Services (R. 16, 227). In the report, Dr. Piyaka noted that Mr. Walker presented with "evident levels of high anxiety and irritability" and reported frequent panic attacks and depression (R. 227). Dr. Piyaka noted that Mr. Walker had difficulty attending to his basic hygienic needs, required supervision with shopping and errands, had a very limited social network, and exhibited a tendency to withdraw and avoid interpersonal contacts (R. 227-28). Dr. Piyaka described Mr. Walker as having a moderately to severely depressed mood, a "violent tendency to emotionality and tearfulness," and a strong presence of anxiety (R. 228). While Mr. Walker was able to manage his own funds, he was unable to do "work-related activities," such as carrying out instructions or interacting appropriately with supervisors and co-workers (R. 230). However, Dr. Piyaka remarked that if medicated (with Clonozepan and Abilify), Mr. Walker "retain[ed] the capacity for concentration and present[ed] with good orientation" regarding place, time, and person (R. 228).

In 2008, Dr. Piyaka's treatment notes indicate that Mr. Walker's symptoms varied considerably. In April 2008, Mr. Walker reported that he had panic attacks and lacked energy and motivation, and Dr. Piyaka noted in April, May, and June 2008 that Mr. Walker had a "blunted affect" (R. 484-86). However, in August 2008, Mr. Walker's night terrors were "gone completely" (R. 482), and in December 2008 Mr. Walker reported having no panic attacks (R. 478).

In 2009, Mr. Walker continued to exhibit mixed signs of improvement and deterioration. In February 2009, Dr. Piyaka noted Mr. Walker had "some anxiety" (R. 457). In addition, while Mr. Walker reported on May 6, 2009, that he was "very pleased" that NAMI had hired him to help out with the newsletter, Dr. Piyaka noted that Mr. Walker's anxiety comes and goes and that he was still experiencing panic attacks (R. 454).

9

Dr. Piyaka completed a Mental Capacities Assessment on March 11, 2009. He reported that Mr. Walker was moderately limited in demonstrating obedience to work rules and supervisors; relating with co-workers; using independent judgment; understanding, remembering, and carrying out simple or complex job instructions; and demonstrating reliability and maintaining personal appearance (R. 281-82). Dr. Piyaka assessed Mr. Walker as markedly limited in dealing with the public; dealing with work stresses; functioning without supervisors; performing reliably in job situations requiring the use of judgment under stress; responding appropriately to usual job situations with co-workers and supervisors; dealing with changes in a routine work setting; behaving in a stable manner in stressful situations; and relating predictably in social situations (*Id.*). Dr. Piyaka opined that Mr. Walker was "unable to work in any capacity" because he had been ill for more than three years and was expected to remain severely disabled for an indefinite period of time (R. 282).

Dr. Piyaka recorded Mr. Walker's GAF score throughout his treatment, and it never reached above a 48 (R. 296, 298-307, 454-57, 477-82).

**3.**

The record also contains notes from ten group therapy sessions from January 23, 2008, through May 6, 2009. At the January 23, 2008 session, group therapy leader Madeleine Warren noted that Mr. Walker presented with a fairly calm mood and was smiling; he had just returned from his trip (R. 399). During three sessions between March 12, 2008, and December 3, 2008, however, Mr. Walker presented with a somewhat depressed mood and subdued demeanor (R. 406, 409, 429). Although on January 7, 2009, Mr. Walker "presented with pleasant mood as evidenced by pleasant demeanor" at a group therapy session (R. 432), between February 11, 2009, and April 29, 2009, Mr. Walker presented with a somewhat anxious mood as evidenced by a tense tone at four different

10

group therapy appointments (R. 435, 440, 443, 448). On May 6, 2009, Mr. Walker again presented with a fairly calm mood at a group therapy session, as evidenced by his smiling, and he reported that he got the job at NAMI and felt both excited and nervous (R. 451).

**4.**

SSA performed several assessments of Mr. Walker's condition in 2007. On September 25, 2007, Dr. Howard Tin performed a Psychiatric Review Technique and a mental Residual Functional Capacities ("RFC") assessment. After an examination of Mr. Walker and a review of Mr. Walker's medical record, Dr. Tin found that Mr. Walker suffered from Bipolar Disorder, but this did not constitute a medically determinable impairment under Listing 12.04, Affective Disorders, because the "B" criteria were not met (R. 237, 244). Dr. Tin noted that Mr. Walker only had a mild restriction in activities of daily living ("ADLs"), moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration (R. 244). Mr. Walker's condition did not exhibit the presence of any "C" criteria of the listings (R. 245). Dr. Tin reported that Mr. Walker can perform household chores including cleaning, cooking, and laundry; keeps appointments; runs errands; and has no significant problems with hygiene (R. 246). Further, Dr. Tin stated that Mr. Walker had no difficulty maintaining social functioning and related to his roommate and others without problems (*Id.*).

In the mental RFC assessment, Dr. Tin opined that Mr. Walker did not have any marked limitations in understanding and memory, sustained concentration and persistence, or social interaction and adaptation (R. 248-49). Further, Mr. Walker was only moderately limited in seven of twenty subcategories of abilities (*Id.*). Dr. Tin reported that there was no evidence that Mr. Walker had any limitation in another seven of these twenty subcategories (*Id.*). In his functional

11

capacity assessment, Dr. Tin remarked that Mr. Walker was "fully oriented, free of thought disorder or serious memory problems" as he could remember locations or work-like procedures and could understand, remember, and carry out short, simple instructions, but not detailed instructions (R. 250). In Dr. Tin's opinion, Mr. Walker was capable of performing simple tasks that did not require maintaining attention or concentration for extended periods of time (*Id.*). Dr. Tin noted that there was evidence that Mr. Walker was unable to interact appropriately with the general public since it was reported Mr. Walker was socially phobic and experienced panic, and thus, Mr. Walker should be limited to "work tasks that do not require interaction with the general public" (*Id.*). Dr. Tin opined that Mr. Walker had the ability to respond appropriately to changes in work settings, to be aware of normal hazards, and to travel in unfamiliar settings and set realistic goals (*Id.*).

On September 26, 2007, Marcus Sherrod, an SSA adjudicator, wrote a "Report of Contact" after meeting Mr. Walker and consulting Dr. Tin's Mental RFC. Mr. Sherrod concluded that Mr. Walker could not perform his past work in transportation system design, but that there were a sufficient number of jobs within the occupational base that accommodated Mr. Walker's limitations -- no dealing with the public, close supervision, or close cooperation with co-workers (R. 170). These jobs included reeler, drier attendant, and skin lifter, bacon, which fall within manufacturing and processing industries, which employ 726,681 people in Illinois (*Id.*).

**5.**

Mr. Walker completed several disability and function reports for SSA. On a disability report from late July 2007,[3] Mr. Walker indicated that he went through "deep depressions off and on" and experienced anxiety attacks where he may run into a wall or just sit without moving (R. 146).

---

[3] The report was completed between Mr. Walker's July 17 and July 25, 2007, appointments at Procare (R. 149).

On August 10, 2007, Mr. Walker completed an "Activities of Daily Living Questionnaire," indicating that he cooked his own meals, performed household chores weekly such as cleaning and laundry, and went grocery shopping weekly (R. 163). Mr. Walker claimed he had problems with concentration, motivation, and forgetfulness (R. 164). He noted that he left home only twice a week, he was not always able to drive due to his panic attacks, and he was a restless sleeper (R. 165). Mr. Walker claimed that he enjoyed people and was not afraid of others, and did not get angry or fight with other people (*Id.*). Finally, Mr. Walker indicated that he drove, read, played cards or games, went to church, watched television or listened to the radio, and talked to neighbors and on the phone somewhat often (R. 166). However, he rarely or never watched children, fixed things, engaged in hobbies, went to sports events, engaged in volunteer activities, paid bills or did finances, went out to eat, went to the movies, or went to school (*Id.*).

Mr. Walker also filled out a "Disability Report - Appeals" in late October 2007 (R. 174).[4] In the report, Mr. Walker claimed that some days he did not want to get out of bed, neglected his hygiene, and either overate or did not eat at all due to depression (R. 178). He had no changes in his daily activities since he last filed a disability report (*Id.*).

Mr. Walker completed a "Function Report - Adult" on December 6, 2007. He claimed that on some days he would stay in bed for most of the day because he was too depressed to do much else (R. 181). He wrote that he felt tired due to his medications, depression made it difficult to dress, and his hands sometimes trembled when he shaved (R. 182). He did dishes for thirty minutes every day but needed reminders from his roommate, and he went grocery shopping twice a week with his

---

[4]The report was completed between Mr. Walker's October 23 and October 30, 2007, Procare appointments (R. 176).

roommate (R. 183-84). He did not go out alone because it was too stressful for him, and he had panic attacks (R. 184). Mr. Walker was able to count change, handle a savings account, and use a checkbook or money orders, although he was unable to pay bills (*Id.*). He read and watched television daily, talked with others, and did not need to be reminded to go places (R. 185). Mr. Walker reported that his condition has made him withdrawn, and it has adversely affected his memory, his ability to complete tasks, his concentration, and the use of his hands (R. 186). His roommate helps him remember to do certain tasks (*Id.*). Furthermore, Mr. Walker stated that he handled stress and changes in routine poorly, and he had terrible panic attacks (R. 187). Nevertheless, he was able to pay attention "a good while," follow written and spoken instructions "well," and get along with authority figures such as bosses "fine" (R. 186-87).

In his last disability report in the record, filled out after February 5, 2008, Mr. Walker again wrote that he sometimes did not get out of bed for days and either ate too much or too often, or did not eat at all due to depression (R. 196).[5]

### C.

The ALJ heard testimony from Mr. Walker, the ME, and the VE at the September 21, 2009 hearing. As explained above, Mr. Walker testified that he last worked July 12, 2006, when he left his job at Quizno's during a panic attack, and never returned (R. 33). Before that, he missed a couple days of work per week due to panic attacks and feeling a "tremendous amount of pressure and stress" (R. 35-36). Mr. Walker also experiences fatigue, depression, fearfulness, mood swings, racing thoughts, and hour-long crying spells (R. 36). On his bad days, he feels apathy toward life and a lack of motivation to get out of bed, although he has trouble sleeping (R. 37, 39). He either has no

[5]The report is undated, but was completed after Mr. Walker's outpatient visit on February 5, 2008 (R. 194).

14

appetite at all or a "voracious" appetite (R. 38). He believes his panic attacks -- which occur from several times a month to every day -- have worsened over time (R. 38). Mr. Walker testified that he was not comfortable driving and did not do any housework, cooking, or cleaning (R. 32-33). He is reluctant to take showers each day and to shave, and he does not do anything for fun (R. 37-39). Once in a great while Mr. Walker has a good, productive day (R. 36). Mr. Walker testified that he did not seek medical treatment for his panic attacks until 2007 because he did not yet have a medical card from the state and was unaware that Cook County Hospital offered those services (R. 42-43). Mr. Walker had not tried any medication other than Abilify, Lexapro, and Klonopin despite his symptoms remaining debilitating (R. 43-44)

The ME had not previously examined Mr. Walker, but had reviewed his case file (R. 42). The ME testified that there was sufficient objective medical evidence indicating that Mr. Walker suffered from a 12.04 affective disorder, namely Bipolar Disorder I, and his most recent episode was of mixed, moderate intensity (R. 45). She also testified that there was a discrepancy between Dr. Piyaka's first and second assessments: the first one in 2007 indicated Mr. Walker retained the capacity for concentration but the one in 2009 indicated that Mr. Walker's condition was severe enough to render him unable to work (*Id.*). The ME, however, did not see evidence of deterioration in Mr. Walker's condition in the record (R. 45-46), because Dr. Piyaka did not change Mr. Walker's medication regimen (R. 51). The ME concluded that as to the "B" criteria, Mr. Walker had "moderate difficulties with activities of daily living; probably marked difficulties with social interaction; mild to moderate difficulties with concentration, persistence, and pace" (R. 46). She did not see any episodes of decompensation and did not believe Mr. Walker met the "C" criteria (*Id.*).

The ME then opined that Mr. Walker's RFC should be limited to work with "no public contact and only perhaps incidental contact with supervisors and peers," routine work with few changes in the environment; and "work that required only average productivity" (R. 46-47). The ME stated that Mr. Walker "needs to be in that therapy" and treated with medication for bipolar disorder (R. 47-48), and she assessed Mr. Walker's symptoms as moderate (R. 48-49). The ME did not take Mr. Walker's GAF score into account because she considered the GAF to be unreliable, invalid, subjective, and reflective of more than just Mr. Walker's psychopathology (R. 49-51).

The VE testified next. She began by questioning Mr. Walker about his past work history. Mr. Walker explained that while working as a transportation systems designer for the railroad company, he dealt with unique computer applications and at times had to run around and lift about twenty pounds (R. 55-57). The VE classified Mr. Walker's work as skilled and performed at the sedentary to light exertion level, though the Dictionary of Occupational Titles ("DOT") classified "systems analyst" as sedentary (R. 58). She classified Mr. Walker's past work as an automobile salesman as skilled and light exertion (*Id.*).

The ALJ asked whether the limitations given by the ME, including no public contact, not many changes, and no high productivity, would eliminate past work (R. 58). The VE confirmed that these limitations would eliminate past work (*Id.*). However, the VE testified that other jobs existed in the Chicago area that would fit Mr. Walker's limitations, including 10,000 housekeeper cleaner jobs, 2,000 hospital food service worker jobs, and 10,000 kitchen helper jobs (R. 59). The housekeeper cleaner job was at a light exertion level, the hospital food service worker and kitchen helper jobs were at medium exertion levels, and all of the jobs were unskilled, and the VE stated that her testimony was consistent with the DOT (*Id.*).

16

Counsel for Mr. Walker asked the VE if Mr. Walker's need to miss three to four days of work per month for his treatment would impact his work (R. 59). The VE replied that any absence of more than one and a half days per month would put Mr. Walker's job at risk (R. 60). Counsel then asked how the limitations contained in Dr. Piyaka's Mental Capacities Assessment from March 11, 2009, would impact someone's ability to work (*Id.*). The VE stated that responding appropriately to usual job situations with coworkers and supervisors was an important element in unskilled work, and Dr. Piyaka opined that Mr. Walker had a marked limitation in this (R. 61). However, the VE would not rule out work on the basis of just one characteristic (*Id.*).

### D.

In his October 13, 2009 written opinion, the ALJ found that Mr. Walker was not under a disability from his alleged onset date of July 15, 2006, to the date of the decision (R. 14). Mr. Walker met the insured status requirements of the Act through September 30, 2010 (*Id.*). At Step 1, the ALJ determined that Mr. Walker had not engaged in substantial gainful activity since the alleged onset date (R. 16). At Step 2, the ALJ determined that Mr. Walker suffered from a severe impairment, bipolar disorder (*Id.*). In coming to this conclusion, the ALJ referenced Mr. Walker's initial diagnosis of Bipolar I Disorder on January 29, 2007, his continuing treatment with therapy and medication (Abilify and Klonopin) for anxiety and depression, Dr. Piyaka's September 2007 Psychiatric Report, Dr. Piyaka's March 11, 2009 Mental Capacities Assessment, and the progress notes at Procare indicating "waxing and waning symptoms" (R. 16-17).

At Step 3, the ALJ found that Mr. Walker did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*Id.*). In making this determination, the ALJ relied on the ME's testimony

at Mr. Walker's administrative hearing that Mr. Walker's condition did not satisfy the "paragraph B" or "paragraph C" criteria to meet or medically equal any of the 12.04 disorders (R. 17-18). The ME had testified that Mr. Walker had only one marked limitation -- in social functioning -- and no episodes of decompensation of extended duration (R. 18). The ALJ found that Mr. Walker retained the residual functional capacity ("RFC") to:

> perform work at all exertional levels but with nonexertional limitations stemming from his mental impairment that preclude public contact, limit him to only incidental contact with supervisors and coworkers, limit him to routine work without a lot of changes, and which require no high productivity expectations.

(R. 18).

In determining Mr. Walker's RFC, the ALJ first found that the medically determinable impairment, bipolar disorder, could reasonably be expected to cause the alleged symptoms (R. 20). To reach this conclusion, the ALJ reviewed, in detail, Mr. Walker's testimony at the administrative hearing, the August 10, 2007 Activities of Daily Living Questionnaire, Mr. Walker's disability and function reports from late October 2007 (the ALJ dated the report November 2007) and December 6, 2007, and the therapist and psychiatrist notes in the record (R. 19-20).

However, the ALJ found that Mr. Walker's statements concerning the intensity, persistence, and limiting effects of his condition's symptoms were "not wholly credible to the extent they are inconsistent with" the ALJ's RFC determination (R. 20). The ALJ stated that the record showed Mr. Walker's symptoms had improved four to five months into his treatment and were manageable with the use of medication (R. 20). To illustrate, the ALJ referenced Mr. Walker's June 2007 "highly enjoyable" trip to North Carolina, an October 2007 report that he was excited about another upcoming vacation, and his feelings of optimism at a November 6, 2007, and December 4, 2007,

meeting with his therapist and starting to take Lexapro (*Id.*). The ALJ also noted that Dr. Piyaka's Psychiatric Report from 2007 indicated that, if medicated, Mr. Walker retained the capacity for concentration and presented with good orientation (*Id.*). In addition, a group therapy report from January 23, 2008, stated that Mr. Walker was calm and relaxed, and after a reported setback in his mood in April 2008, his mood improved and in August 2008 (R. 21). Mr. Walker was also feeling better, calm, and smiling at group therapy in April and May 2009 (*Id.*).

The ALJ stated that while he considered and accommodated many of the limitations specified in Dr. Piyaka's Mental Capacities Assessment from 2009 into the RFC, he was "not persuaded that the claimant is unable to perform any type of substantial gainful activity" (R. 21). The ALJ discounted Dr. Piyaka's opinion because the ALJ assumed that Dr. Piyaka was "sympathetic" to Mr. Walker's complaints and was "relying on subjective reports rather than objective findings in forming his opinions regarding the claimant's ability to work" because of their lengthy -- over three years -- doctor-patient relationship (*Id.*).

By contrast, the ALJ gave the ME's opinions "very substantial weight" because "she is a specialist, is familiar with the disability program, and has had the opportunity to review and evaluate the entire record, including both the written documentation and hearing testimony" (R. 22). The ALJ relied on the ME's opinion that Mr. Walker "has been maintained on the same medications since the beginning of his treatment" and that the treatment records do not reflect that Mr. Walker's condition was becoming worse despite the 2009 Mental Capacities Assessment indicating the contrary and adopted into Mr. Walker's RFC the work-related limitations suggested by the ME at the hearing (R. 21-22). The ALJ adopted the ME's testimony that Mr. Walker's GAF score "cannot be considered

in this case because these scores are unreliable and are reflective of many different things including life circumstances" (R. 22).

At Step 4, the ALJ found that Mr. Walker was unable to perform his past relevant work as a transportation systems designer, systems analyst, or auto salesman because the VE testified that these jobs were all skilled in nature (R. 22). At Step 5, the ALJ ruled that the transferability of job skills was not material because Mr. Walker had solely nonexertional limitations under Section 204.00 of the Medical-Vocational Guidelines, and could perform all or substantially all of the exertional demands of a significant number of unskilled jobs with the limitations in the RFC (R. 22-23). Specifically, the VE had testified that given Mr. Walker's age, education, work experience, and RFC, the following jobs were available in the Chicago Metropolitan Area: housekeeper/cleaner (10,000 jobs), hospital food service worker (2,000 jobs), and kitchen helper (10,000 jobs) (R. 23). Thus, the ALJ found that Mr. Walker was not under a disability as defined by the Act (*Id.*).

### III.

We begin our analysis with a brief overview of the relevant legal standards governing appeals from the Commissioner's final decisions. To establish disability under the Act, the claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.* at § 423(d)(1)(A). Substantial gainful activity includes work of the type a claimant did before the impairment and any other kind of gainful work generally available in the national economy. *Id.*

The social security regulations contain a required five-step sequential analysis for determining whether a claimant is considered disabled under the law. 20 C.F.R. § 404.1520(a)(4).

These steps are evaluated sequentially and require the ALJ to determine: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether any of the claimant's impairments meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his or her past relevant work based on her RFC: and (5) whether the claimant's RFC renders her unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The claimant has the burden of proof in Steps 1 through 4. 20 C.F.R. § 404.1520(g)(1). By satisfying this burden, the claimant makes a *prima facie* case of disability, and the burden shifts to the Commissioner in Step 5 to prove that significant jobs are available in the national economy for an employee with the claimant's RFC. 20 C.F.R. §§ 404.1520(g); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). A vocational expert's testimony, if reliable, can satisfy the Commissioner's burden of determining whether a significant number of jobs exist in the economy. *Overman v. Astrue*, 546 F.3d 456, 460 (7th Cir. 2008).

While judicial review of ALJ decisions is "deferential," it is "not abject." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). We uphold an ALJ's decision if it is supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d at 471, 475 (7th Cir. 2009) (internal citations and quotations omitted). The ALJ must consider all relevant evidence, and may not select and discuss only the evidence which favors his or her ultimate conclusion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While the ALJ is not required to address every piece of evidence or testimony

presented, the Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker*, 597 F.3d at 921 (internal citations omitted); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

Further, we must be able to "track" the analysis to ensure the ALJ considered all the important evidence. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). If the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). In determining whether the ALJ has satisfied this burden, the Court will not re-weigh evidence, resolve material conflicts, make independent findings of fact, make decisions of credibility, or substitute its judgment for that of the Commissioner. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

## IV.

In this case, Mr. Walker attacks the ALJ's failure to give Dr. Piyaka's medical opinion controlling weight (doc. # 21: Pl.'s Mem. at 11-13). The medical record demonstrates that Dr. Piyaka, a psychiatrist, treated Mr. Walker from April 18, 2007, until May 6, 2009. On March 11, 2009, Dr. Piyaka opined that Mr. Walker was markedly limited in his ability to deal with the public, deal with work stresses, function without supervision, maintain attention to detail, perform reliably in job situations requiring the use of judgment under stress, respond appropriately to usual job situations with co-workers and supervisors, deal with changes in a routine work setting, behave in a stable manner in stressful situations, and relate predictably in social situations (R. 281-82). Dr. Piyaka also opined that Mr. Walker was "unable to work in any capacity" (R. 282). Though the ALJ incorporated "many" of the limitations in Dr. Piyaka's assessment in the RFC -- limiting Mr. Walker

to work with no public contact, only incidental contact with supervisors and coworker, routine work without many changes, and only average productivity expectations -- the ALJ was "not persuaded that the claimant is unable to perform any type of substantial gainful activity" (R. 18, 21).

In the Seventh Circuit, "an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) it is not inconsistent with substantial evidence in the record. "If the opinion is unsupported or inconsistent with the record, the ALJ may still choose to accept it, but if the ALJ rejects the opinion, he must give a good reason." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)) (internal quotations omitted). If the "ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *see also Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (reversing the district court's affirmance of the ALJ's decision because the ALJ failed to properly address whether the plaintiff's treating orthopedic specialist's opinion should be accorded controlling or even substantial weight).

In applying these standards, we find several problems with the ALJ's analysis.

## A.

*First,* the reasons the ALJ gave for refusing to give Dr. Piyaka's opinion controlling weight were insufficient. As explained above, an ALJ must give a treating physician's opinion controlling weight if the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in the record. *Schaaf*, 602 F.3d at 875.

23

The ALJ stated that Dr. Piyaka's opinion was based on "subjective reports rather than objective findings" (R. 21). But, the ALJ (and the ME in her testimony) did not identify objective tests that Dr. Piyaka could or should have performed to assess the severity of Mr. Walker's bipolar disorder. We are mindful that the Seventh Circuit has held that "medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Here, contrary to the Commissioner's arguments, Dr. Piyaka and Mr. Walker's therapist -- with whom Dr. Piyaka met regularly -- did not merely report uncritically Mr. Walker's complaints. They also recorded multiple observations they made of Mr. Walker's appearance and demeanor during their meetings (*see, e.g.*, R. 227-28, 314-21, 380-89, 402-07, 484-8).

Furthermore, "[a]n ALJ may not ignore a claimant's subjective reports of pain or mental impairments simply because they are not fully supported by objective medical evidence . . ." *Seamon v. Astrue*, 364 Fed. Appx. 243, 250 (7th Cir. 2010) (citing *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005)). While discrepancies between objective evidence and self-reports is probative of exaggeration, here the ALJ did not point to any objective evidence contradicting Mr. Walker's subjective complaints. *Id.*; *cf. Burton v. Barnhart*, 203 Fed. Appx. 737, 741-42 (7th Cir. 2006) (holding that the ALJ permissibly discounted the physician's opinion where the physician relied "solely" on the claimant's subjective complaints, and the record was "devoid" of any reports of objective testing of the claimant's mental limitations).

The ALJ also sought to justify his decision not to incorporate all of Mr. Walker's limitations articulated in Dr. Piyaka's March 11, 2009 assessment by stating that the lengthy doctor-patient relationship between Dr. Piyaka and Mr. Walker made it "reasonable to *assume* that Dr. Piyaka is

sympathetic to his patient's complaints" (R. 21) (emphasis added). That assumption was not reasonable, but instead was contrary to law. In *Moss*, the Seventh Circuit held that the ALJ improperly discounted the opinion of the claimant's treating doctor based on "speculation" that the opinion was unreliable because the claimant's attorney recommended the doctor and the doctor reported directly to the attorney. *Moss*, 555 F.3d at 560-61. "An ALJ's conjecture is never a permitted basis for ignoring a treating physician's views." *Id.* at 560. While the fear exists that a treating source may "bend over backwards to assist a patient in obtaining benefits," 20 C.F.R. § 404.1527(d)(2) addresses that concern with its "searching inquiry" that weeds out "those doctors who are either poorly versed in their patient's condition or unable to opine objectively." *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011) (citing *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)).

Here, the ALJ failed to engage in that "searching inquiry." The ALJ pointed to no evidence that the length of the doctor-patient relationship between Dr. Piyaka and Mr. Walker clouded Dr. Piyaka's judgment and caused Dr. Piyaka to skew his findings. To the contrary, the ALJ failed to discuss or cite to evidence that Dr. Piyaka's finding in March 2009 that Mr. Walker cannot work is in fact consistent with the finding he made in September 2007 -- after treating Mr. Walker for five months -- that he was unable to perform work related activities (R. 230). The ALJ's rejection of Dr. Piyaka's opinion based on the mere length of the doctor-patient relationship falls into the category of speculation that is not permitted under *Moss*.

**B.**

*Second*, the ALJ erred by failing to state how much weight he gave Dr. Piyaka's opinion. The ALJ stated that he considered Dr. Piyaka's report, "accommodated many of these limitations"

in the RFC, but was "not persuaded that the claimant is unable to perform any type of substantial gainful activity" (R. 21). The ALJ is required to determine what weight the treating physician's opinion is due under the applicable regulations. *Larson*, 615 F.3d at 751. In *Larson*, the Seventh Circuit held that the ALJ did not adequately articulate what weight he attributed to the treating physician where he stated that the treating physician's opinion was entitled to "some weight." *Id.* The ALJ's statements in this case were similarly vague as to what weight the ALJ attributed to Dr. Piyaka's opinion, and thus the ALJ's analysis was insufficient.

## C.

*Third*, the ALJ improperly chose to disregard Dr. Piyaka's assessment of Mr. Walker's GAF. While an ALJ need not "determine the extent of an individual's disability based *entirely* on his GAF score," *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (emphasis added), consistently low GAF scores are relevant to an ALJ's mental disability determination. *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010) (holding that consistent GAF rating under 50 would affect assessment of claimant's mental functional capacity); *see also Punzio v. Astrue*, 630 F.3d 704, 710-11 (finding that treatment notes were not inconsistent with GAF scores). While not dispositive, "[t]he GAF scale reports a clinician's assessment of the individual's overall level of functioning," and "[a] GAF of 50 indicates serious symptoms or functional limitations." *McClendon v. Astrue*, No. 09 C 3739, 2010 WL 1922765, at *9 (N.D. Ill. May 12, 2010) (quoting *Craft*, 539 F.3d at 676 n.7).

In *McClendon*, this Court noted that it was "especially concerned that the ALJ dismissed without any proper basis [the claimant's] low GAF score of 45." *Id.* In this case, Mr. Walker's GAF scores as assessed by Dr. Piyaka never reached above 48, "reflecting serious symptoms or serious impairment in social or occupational functioning, for example, the inability to keep a job."

*Campbell*, 627 F.3d at 302. While not definitive of disability, the GAF score is objective evidence that supports Dr. Piyaka's opinion that Mr. Walker was "unable to work in any capacity." The ALJ was not entitled to simply reject out of hand as "unreliable" evidence that the Seventh Circuit has held probative on the question of disability.

## CONCLUSION

For the foregoing reasons, this Court directs the Clerk of the Court to enter judgment granting Mr. Walker's motion for summary judgment (doc. #19) and denying the Commissioner's motion for summary judgment (doc. #22). We thus reverse and remand for proceedings consistent with this Memorandum Opinion and Order. The case is terminated.[6]

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: July 13, 2011

---

[6]As a result of our reversal and remand, the Court does not reach Mr. Walker's claim that the ALJ erred in giving the ME's opinion very substantial weight. We also have no need to address Mr. Walker's challenge to the ALJ's credibility determination. On remand, the ALJ should consider these matters afresh. In so doing, the ALJ should be mindful of the need to assess the entire record of Mr. Walker's treatment, and to consider not only his periods of improvement but also his periods of regression. The ALJ should consider whether the sporadic improvements noted in Mr. Walker's condition are common for a person with a chronic disease such as bipolar disorder who is treated with drugs, in view of the Seventh Circuit's observation that people so afflicted are "likely to have better days and worse days," but so long as the worse days prevent them from holding down a full-time job, they would be considered disabled. *See Bauer*, 532 F.3d at 609.

27